IN IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Lamarcus T. Williamson, | ) | C/A No.: 1:20-2505-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER AND |
| Michael Stephan, Head Nurse Ms. | ) | REPORT AND |
| Olds, and Unit Manager Paul | ) | RECOMMENDATION |
| Dennis, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Lamarcus T. Williamson ("Plaintiff"), proceeding pro se and in forma pauperis, filed this action pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights as an inmate in the South Carolina Department of Corrections ("SCDC") housed at Broad River Correctional Institution ("BRCI") in the crisis stabilization unit ("CSU"). Plaintiff names as defendants Michael Stephan ("Stephan"), the warden at BRCI, Ms. Olds ("Olds"), the head nurse of CSU, and Paul Dennis ("Dennis"), the unit manager of CSU (collectively, "Defendants").[1]

This matter is before the court on Defendants' motion for summary judgment [ECF No. 26]. Having been fully briefed [ECF No. 31], the motion is

---

[1] According to Defendants' motion, Plaintiff misspells the name Stephan. The undersigned uses the correct spelling and directs the Clerk of Court to correct

ripe for disposition. Also before the court are Plaintiff's motions for discovery and to appoint counsel. [ECF Nos. 23, 30]. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), this matter has been referred to the undersigned for all pretrial proceedings. Having carefully considered the record, the undersigned denies Plaintiff's motions and recommends the district judge grant Defendants' motion for summary judgment.

## I.    Factual Background

Defendants have put forth the following undisputed facts.[2] On January 13, 2020, Plaintiff was discharged from the Kirkland Correctional Institution ("KCI") Infirmary to the Choices Program at KCI after being treated for a self-inflicted open abdominal wound. [ECF No. 26-15 at 24–25].[3] On January 21, 2020, Plaintiff eviscerated his abdominal wound by a self-inflicted laceration, and he also swallowed a razor. *Id.* at 19. Plaintiff was transferred to the Prisma Health Richland ER where 19 staples were used to close his

---

the docket to so reflect.

[2] Plaintiff has failed to put forth any admissible evidence. In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991). However, Plaintiff's complaint, amended complaint, and his response to Defendants' motion are not verified. [*See* ECF Nos. 1, 9, 31]. Plaintiff also has not submitted any evidence in his filings.

[3] Based on the record, the Choices Program involves group therapy, separate living and staffing arrangements, and "is designed to help inmates like

wound. *Id.* at 9, 16. On January 24, 2020, Plaintiff was discharged from the hospital to CSU at BRCI. *Id.* at 7. Inmates are housed at CSU when they have active thoughts of suicide and/or of harming themselves or have harmed themselves. [ECF No. 26-2 at 3].

On admission to CSU, Plaintiff met with a treatment team, including Olds, and reported he was "fed up" with the mental health care he had received, his suicide thoughts were serious, he had no self-control, and he was addicted to self-injurious behavior. [ECF No. 26-15 at 3, 9]. Plaintiff was placed on one-on-one observation due to thoughts of suicide and the means to self-harm by taking the staples out of his abdomen. *Id.* The staples were to be removed on February 4, 2020. *Id.* During his time at CSU, Plaintiff received routine wound care. [ECF No. 26-14 at 13]. Plaintiff was assessed on January 27, 2020, that his anxiety, depression, impulse control, and suicidality was all "significant and worsened." *Id.* at 7–8. On January 28, 2020, Plaintiff was discharged from CSU back to KCI to participate in the Choices Program. [ECF No. 26-13 at 23, 29].

At KCI, Plaintiff's wound dressings were changed. *Id.* at 8, 24–25. Plaintiff reported an increase in the urges to cut himself, but he said the last time he cut himself, he got scared, because he saw his "guts." *Id.* at 12. He did not want to cut, but it had become a habit. *Id.* Plaintiff's impulse control was

---

[Plaintiff]." [*See* ECF No. 26-14 at 9; *see also, e.g.*, ECF No. 26-12 at 13, 17].

significant. *Id.* On February 9, 2020, Plaintiff said he was thinking about harming himself, so he was placed on Crisis Intervention. [ECF No. 26-12 at 30–31]. On February 11, 2020, he told a mental health counselor that he did not want to engage in self-injurious behavior and that he had "left that behind." *Id.* at 21. On February 12, 2020, he told a counselor that his top priorities were to "apply what he had learned and to stop self harming." *Id.* at 15. He was discharged from Crisis Intervention, but remained at KCI. *Id.* at 17.

On February 25, 2020, Plaintiff asked to be removed from the Choices Program because he was feeling threatened by other individuals in the program. [ECF No. 26-11 at 25–26]. He had no plans to harm himself or others, but said he would protect himself, if someone tried to hurt him. *Id.* An hour after participating in an individual counseling session, Plaintiff threatened to cut himself. *Id.* at 21. He was placed on Crisis Intervention and transferred to CSU, where he immediately used a razor to make a large, deep cut to his mid-abdomen. *Id.* at 17, 22. The doctor ordered Plaintiff transferred immediately to the hospital, where the wound was treated by a colostomy, a surgical procedure that routes one end of the large intestine out through an incision in the abdominal wall to create a stoma, which is the opening in the skin where a bag for collecting feces is attached. [ECF No. 26-11 at 10, ECF No. 26-10 at 24, *see also* ECF No. 26-2 at 4].

On February 26, 2020, Plaintiff was discharged from the hospital to the KCI Infirmary and placed on Crisis Intervention. [ECF No. 26-10 at 27, 11]. On March 2, 2020, a doctor evaluated Plaintiff's complaint of frequent bowel movements, nausea, increased abdominal tenderness, and abdominal pain. [ECF No. 26-9 at 27]. The doctor ordered medications and ordered the nurses to monitor for signs of infection. *Id.* at 28. Plaintiff was discharged from the KCI Infirmary on March 2, 2020. *Id.* at 19. Because Plaintiff became angry and refused to leave, additional officers were required to transport Plaintiff to a KCI dorm. *Id.*

On March 3, 2020, at 2:00 a.m., Plaintiff's colostomy bag was leaking. *Id.* at 17–18. He was escorted to the KCI Infirmary, where a new bag was fitted and placed without difficulty. *Id.* At 11:45 p.m. the same day, Plaintiff said his colostomy bag needed changing, and he felt suicidal. *Id.* at 13–14. The nurse changed the bag and called mental health, who placed Plaintiff on Crisis Intervention. *Id.*

During a crisis visit on the morning of March 4, 2020, Plaintiff complained to the counselor he was receiving unreasonable medical care for his colostomy bag and his cell was filthy due to lack of medical care. *Id.* at 10–12. He wanted a transfer to Gilliam Psychiatric Hospital ("GPH") or to CSU where he could receive 24-hour nursing care. *Id.* At 3:05 p.m. the same day during a crisis visit, Plaintiff reported he was upset the nurse did not

change his colostomy bag, claiming he had problems with it since 7:00 a.m. *Id.* at 5–6. The counselor told Plaintiff he would be taken to the KCI Infirmary to have his bag changed and he would receive education about how to care for his medical needs and colostomy bag. *Id.*

On March 5, 2020, Plaintiff demanded his bag be changed due to leakage. [ECF No. 26-8 at 30]. The nurse attempted to have Plaintiff change the bag in his cell with easy step-by-step directions, but Plaintiff refused to comply with the instructions. *Id.* After showering, he was escorted to the medical office, where the nurse changed the bag. *Id.* That afternoon, Plaintiff was transferred to from KCI to CSU at BRCI. *Id.* at 27–29. The nurse reported Plaintiff was aggressive toward female staff. *Id.*[4]

On March 6, 2020, at 10:46 a.m., a nurse changed the colostomy bag, noting Plaintiff was "allowed to wash after bag changed by security r/t feces on genitals" and that "[n]o concerns [were] voiced at present time." *Id.* at 21. On March 7, 2020, at 8:27 a.m., Plaintiff was escorted to the medical office to change the colostomy bag. *Id.* at 18. He was given instructions on changing and caring for the bag. *Id.* He voiced understanding of the procedure. *Id.* During the crisis visit at 10:13 a.m. on March 7, 2020, the counselor reported Plaintiff was trained on how to change his bag, and the nurse stated Plaintiff

---

[4] Plaintiff, without supporting admissible evidence, alleges when he was to CSU, he notified Olds that he had a colostomy bag and that the nurse at KCI

was cooperative. *Id.* at 16–17.

On March 7, 2020, at 10:18 a.m., Plaintiff told the Nurse Practitioner that he was not receiving appropriate care for his colostomy and that he wakes up with feces all over himself. *Id.* at 10–11. He said he was suicidal. *Id.* He reported being educated about how to care for his colostomy. *Id.* Plaintiff claimed the hospital doctor was planning to close the stoma, but did not because the doctor was tired of treating inmates and sent him back to the prison. *Id.* The Nurse Practitioner assessed Plaintiff as not being a reliable historian and having impulse control problems, concluding he should remain at CSU. *Id.* The Nurse Practitioner further reported Plaintiff could take care of the colostomy, but apparently the stoma had a very irregular border and did not granulate normally, and a seal with the bag was poor. *Id.*

On March 7, 2020, Plaintiff was escorted to the treatment room at noon due to the bag leaking. *Id.* at 7. The nurse reinforced the bag with stoma tape and paste. *Id.* At 2:00 p.m., Plaintiff was escorted back to the treatment room due to leakage again. *Id.* A new colostomy bag and wafer were applied with stoma paste. *Id.*

The next day at 8:30 a.m. on March 8, 2020, the nurse reported Plaintiff took meals and appeared to take medication in his cell. *Id.* at 4. He did not voice any concerns and was in no acute distress. *Id.* He moved around

refused to send his medical supplies to CSU. [ECF No. 9 at 5–6].

his room and spoke to staff at meal delivery and rounds. *Id.*[5]

On March 9, 2020, Plaintiff requested supplemental nutrition because he felt he was not retaining any nutrients. [ECF No. 26-7 at 26, 29]. During a crisis visit on March 9, 2020, Plaintiff told the counselor he did not like smelling his own feces on a constant basis, and he was eating meals, drinking fluids, and showering when offered. *Id.* at 23–25. He was very critical of the SCDC and its staff. *Id.* On March 10, 2020, at 12:49 p.m., Plaintiff was escorted to the treatment room for a new colostomy bag. *Id.* at 15–16.

On the same day, at 4:00 p.m. during a counseling session, Plaintiff told the counselor about the lack of care for his colostomy bag. *Id.* at 12–13. He wanted to be transferred to GPH where he said he would get better care from nursing there, because it had 24-hour care that he did not have at CSU. *Id.* Plaintiff was afraid of being in his cell with his bag leaking and not being able to go to medical to have the bag changed. *Id.* Plaintiff claimed he did not

---

[5] Plaintiff, without supporting admissible evidence, alleges his colostomy bag burst on March 7, 2020, which caused him to have "deafication, body fluid, food, stomach acid com[]ing out of [his] stomach, burning [his] stomach" for almost 24 hours, from 5:30 p.m. on March 7, 2020, to 8:30 am on March 8, 2020 and that Olds and Dennis were notified, but they failed to do anything about it, and left him lying in pain until he received treatment in the morning. [ECF No. 9 at 5–6]. However, the undisputed facts presented above, taken from Plaintiff's medical records, do not support his allegations that he had difficulties with his colostomy bag during this time frame or that nurses notified any of the Defendants about any of Plaintiff's alleged complaints. Defendants have also put forth undisputed evidence that neither Dennis nor Old worked the night shift in March 2020. [*See* ECF No. 26-2 at 10].

know how to change his bag. *Id.* He remained on Crisis Intervention. *Id.*

Plaintiff refused his breakfast and morning medications on March 11, 2020. *Id.* at 7. That afternoon, Plaintiff refused to go to his cell door due to pain in his lower stomach area. *Id.* at 5. During a crisis visit on March 12, 2020, around noon, Plaintiff remained lying down, but no distress was noted, no medical concerns were voiced during the morning, Plaintiff ate breakfast, and monitoring was continued. *Id.* at 2.

Also on March 12, 2020, at 1:59 p.m., during a crisis visit, Plaintiff told the counselor the hospital doctors said the colostomy could be reversed in 6 months to a year. [ECF No. 26-6 at 29–30]. He once again said he did not know how to care for himself and would like to know how to change his bag. *Id.* He was scared about becoming infected and septic from the unclean prison environment. *Id.*

On March 13, 2020, at about 11:00 a.m., Plaintiff was escorted to the treatment room for colostomy care. *Id.* at 21. The bag was changed. *Id.* The nurse reported the skin around the stoma was healing. *Id.* During a crisis visit the same day, Plaintiff told the counselor the staff was not treating him fairly given his medical issues. *Id.* at 19. He felt only white inmates got the option of going to GPH or to Correct Care. *Id.* He said his bag burst at 5 a.m. that morning, and he had to sit with feces for hours before seeing medical. *Id.* Plaintiff said he was scared it would happen again once he left CSU and was

9

transferred to KCI where he would not have medical staff around to assist him. *Id.* He said he was not receiving the same treatment as other inmates, and the staff was making him suffer. *Id.* The practitioner informed Plaintiff she would discuss the matter with Olds and "review his case to determine what steps needed to be taken medically." *Id.* The practitioner also noted that she had been informed by the nursing staff that Plaintiff "does have difficulty with his bags sticking." *Id.*

When a nurse gave Plaintiff his medications in the morning on March 14, 2020, his colostomy bag was patent, and no drainage was noted from the edges of the bag. *Id.* at 13. Plaintiff remained on Crisis Intervention. *Id.* Plaintiff's colostomy bag and wafer were changed in the morning on March 16, 2020. [ECF No. 26-5 at 31].

On March 17, 2020, security took Plaintiff to the treatment room. [ECF No. 26-5 at 22]. He had removed his bag in the shower and scrubbed the paste from his skin. *Id.* The nurse applied a new wafer and bag. *Id.* During a crisis visit at 10:27 a.m. on March 17, 2020, Plaintiff said he was suicidal due to unreasonable medical care for his colostomy. *Id.* at 18–20. He said his bag was leaking more than normal. *Id.* Nursing staff reported Plaintiff was competent to manage the bag on his own, except for cutting the bag to its proper size. *Id.* Plaintiff continued to want 24-hour nursing care at GPH or at Well Path, and he continued to be concerned about becoming septic. *Id.* When

Plaintiff found out he was not going to GPH, he said he wanted lock-up. *Id.*

Plaintiff was assessed as having difficulty accepting that he hurt himself more than intended, which resulted in the inconvenience of the colostomy and the attendant social issues it caused. *Id.* The counselor said Plaintiff's primary issue was placement in that he wanted to be at a facility where a nurse would be at his "beck and call if/when he has a problem w/ his bag." *Id.*

During the treatment team meeting at noon on March 17, 2020, the staff discussed Plaintiff's ongoing suicidal thoughts due to having the colostomy bag and not being able to care for himself. *Id.* at 15–16. Plaintiff continued to express a need to be placed at GPH for 24-hour nursing after discharge from CSU and not to be transferred to a facility that did not have 24-hour nursing. *Id.*

In the morning on March 18, 2020, Plaintiff was in no distress and did not have any medical complaints. *Id.* at 10.[6] At sick call at noon on March 18, 2020, Plaintiff complained about his food not digesting. *Id.* at 7–9. There were

---

[6] Plaintiff, without supporting admissible evidence, alleges his colostomy bag burst again on March 17, 2020, which caused him to have the same problems as on March 7, 2020, from 5:30 p.m. on March 17, 2020, to 8:30 am on March 18, 2020 and that Olds and Dennis were notified, but they failed to do anything about it, and left him lying in pain until he received treatment in the morning. [ECF No. 9 at 5–6]. However, the undisputed evidence presented above does not support Plaintiff's allegations he had difficulties with his colostomy bag during this time frame or that nurses notified any of

large amounts of food in his colostomy bag. *Id.* The increased GI motility started three weeks earlier. *Id.* Plaintiff also wanted supplements due to decreased absorption of nutrients. *Id.*

On March 19, 2020, Plaintiff was taken to the treatment room because his bag had burst. [ECF No. 26-4 at 27–28]. There was no bag present over the stoma when Plaintiff arrived. *Id.* The nurse applied a new bag. *Id.* On March 21, 2020, during an individual counseling session, Plaintiff complained about CSU clinical services not addressing his coping skills and development needs. *Id.* at 13. He said he was ready to return to KCI. *Id.* Plaintiff mentioned that he planned to file a malpractice lawsuit against various health care professional at SCDC. *Id.*

During a crisis visit on March 22, 2020, Plaintiff refused to speak with the counselor. *Id.* at 3. The day before, Plaintiff became upset with the nursing staff about his pills and started cursing at security because he thought they were going to gas him. *Id.* He then directed his anger to mental health staff and said the program was not productive because he had been to the treatment team multiple times without a treatment plan. *Id.* He planned to file grievances or lawsuits against CSU staff. *Id.* He also wanted to be discharged to KCI for programming and medical care. *Id.*

On March 23, 2020, Plaintiff told the counselor he wanted to go to ICS,

---

the Defendants about any of Plaintiff's alleged complaints.

because he was not receiving any group therapy and needed help. [ECF No. 26-3 at 27].[7] The counselor told Plaintiff he did not diagnostically qualify for ICS. *Id.* Plaintiff said he would go back to the Choices Program, if a certain inmate was not there, because he was concerned about being harmed and having to use a weapon to defend himself. *Id.* The counselor recommended discharge from Crisis Intervention and CSU. *Id.*

Plaintiff's colostomy bag was changed on March 23, 2020. *Id.* at 19. On March 24, 2020, at 8:00 p.m., Plaintiff said his colostomy bag burst, but it was only leaking at the bottom of the bag. *Id.* at 10. Because of lack of staff on the night shift, the nurse could not change the bag. *Id.* The nurse offered Plaintiff supplies to change the bag and to clean the site himself. *Id.* He refused. *Id.* He wanted the procedure done the way the day shift did it, to include hot towels to melt the adhesive. *Id.* Plaintiff threatened to flood the cell via the sprinkler system if the bag was not changed. *Id.* At 11:43 p.m., the nurse gave Plaintiff the supplies needed to clean and re-seal the bottom of the colostomy bag that was leaking. *Id.* at 7. Plaintiff was cooperative and appreciative. *Id.*

The parties agree Plaintiff was discharged from CSU on March 25, 2020, and sent to GPH with 5 colostomy bags and his medications. [ECF No.

---

[7] The record shows Plaintiff had previously been placed in the ICS program in 2017. [*See* ECF No. 26-14 at 24]. The record does not provide further

26-2 at 10, ECF No. 26-3 at 2–4 (listing Olds as having spoken to a Choices Nurse), *see also* ECF No. 9 at 6].[8]

Except where otherwise noted, none of the Defendants are referenced in Plaintiff's medical records with the exception of Dennis, who is listed as having been consulted concerning Plaintiff's placement accommodations, for example, in the Choices Program, on March 23 and 25, 2020. [ECF No. 26-3 at 5, 27].

On April 17, 2020, Plaintiff filed an inmate grievance form, step one, grieving about a leak that occurred to his colostomy bag on March 6, 2020, to March 7, 2020, and that Plaintiff did not receive appropriate care. [*See* ECF No. 26-16 at 2]. The response on the form states Plaintiff failed to attempt informal resolution by contacting Olds prior to filing the grievance and that

---

information about this program.

[8] Plaintiff, without supporting admissible evidence, alleges generally that he was subjected to the coronavirus pandemic during the March 7 and March 17, 2020 incidents; the leaking fluid, stomach acid, and "deification," pealed the skin off his stomach and made the hole more open causing more "deafication" to come out of it; it took almost 3 months to heal; he requested to see a medical doctor and went to sick call, but he did not get any doctor treatment for 20 days; and he had extreme pain and "deafication" leaking out of his stomach, with no food digesting and no nutritional supplement. [ECF No. 9 at 5–6]. However, the undisputed evidence presented above does not support Plaintiff's allegations and does not indicate Plaintiff had any skin problems, burned skin, infection, or sepsis from the colostomy bag leaks or that the leaks caused the stoma to become bigger or caused food not to digest. Additionally, Defendants have put forth undisputed evidence that leaks and food not digesting are common problems from colostomy bags and that leaks are not serious medical problems unless untreated. [ECF No. 26-2 at 10–11].

Plaintiff must utilize the inmate Kiosk system or a request to staff member ("RTSM") form, directing Plaintiff to file a new grievance within applicable timelines after receiving an answered RTSM. *See id.*[9]

## II.   Discussion

### A.   Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

---

[9] Plaintiff, without supporting admissible evidence, alleges he submitted a RTSM to Stephan to attempt an informal resolution before filing a grievance but that the RTSM was not answered and his grievance was not processed. [ECF No. 9 at 7–8].

56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

    B.    Analysis

        1.    Eleventh Amendment Immunity

Plaintiff asserts claims pursuant to 42 U.S.C. § 1983. [ECF No. 9 at 4]. A civil action brought pursuant to 42 U.S.C. § 1983 provides a means to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States, but the statute is not, itself, a

source of substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "Section 1983 imposes liability on any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983). "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).

The Eleventh Amendment provides, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The United States Supreme Court has long held the Eleventh Amendment also precludes suits against a state by one of its own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). This immunity extends not only to suits against a state per se, but also to suits against agents and instrumentalities of the state. *Cash v. Granville Cnty. Bd. of Ed.*, 242 F.3d 219, 222 (4th Cir. 2001).

A plaintiff "is not entitled to monetary damages under § 1983 against Defendants in their official capacities." *Moneyhan v. Keller*, 563 F. App'x 256,

258 (4th Cir. 2014) (citing *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (holding that Eleventh Amendment bars suits against non-consenting state, its agencies, and its officers acting in their official capacities)). However, suits for damages against state officials sued in their individual capacity are not barred by the Eleventh Amendment. *See Hafer v. Melo*, 502 U.S. 21, 30–31 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983.") (citation omitted).

Here, it is undisputed that at the time of the matters alleged in the complaint, Defendants were SCDC employees. To the extent Plaintiff sues Defendants in their official capacities, they are not subject to suit under § 1983, and the undersigned recommends the district judge grant Defendants' motion for summary judgment regarding claims brought against them in their official capacity.

2.    Deliberate Indifference to Serious Medical Needs

To the extent Plaintiff sues Defendants in their individual capacities, he has failed to submit any admissible evidence in support of these claims, and review of the record reveals Defendants were not deliberately indifferent to his serious medical needs.

To establish an Eighth Amendment violation, Plaintiff must show Defendants exhibited "deliberate indifference" to his "serious medical needs."

*Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). A claim of deliberate medical indifference requires more than a showing of mere negligence, *Estelle v. Gamble*, 429 U.S. 97, 105–106 (1976), and "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Fourth Circuit has noted treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).

Additionally, under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

Plaintiff has failed to submit any admissible evidence in support of his claims. Additionally, it is unclear when he claims alleged constitutional violations occurred. [*See, e.g.*, ECF No. 9 (alleging he was left unattended for 24 hours and in pain on March 7 and March 17, 2020), ECF No. 26-16 at 2 (alleging he was left unattended for 24 hours and in pain on March 6, 2020)]. Notwithstanding when Plaintiff alleges his rights were violated, the undisputed evidence confirms that Plaintiff had many difficulties with his colostomy bag during the month of March 2020, but the record additionally reveals Plaintiff was seen by doctors, nurses, and health care providers constantly and continually during the relevant time period. It is additionally undisputed, as put forth by Defendants, that "[d]uring the time Plaintiff was in CSU, the necessary colostomy supplies were available to take care of any problems Plaintiff had with the colostomy bags, including leaks." [ECF No.

26-2 at 11]. The treatment Plaintiff received from the SCDC medical staff was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

Based on the record before the court, there is no triable issue of fact as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs, particularly in that the evidence presented does not indicate either of the CSU defendants, Olds or Dennis, were on duty during the hours Plaintiff alleges he had difficulties, no matter the particular day.[10] Because the record reveals no constitutional violation, Defendants are entitled to qualified immunity. Accordingly, the undersigned recommends the district judge grant Defendants' motion for summary judgment as to Plaintiff's claims for deliberate indifference to medical needs.

### 3.    Claims Regarding Grievance Procedures

To the extent Plaintiff attempts to state a claim against Stephan, or any other defendant, for failure to respond to his RTSM, the claim fails where Plaintiff is not constitutionally entitled to a grievance or RTSM procedures. "[T]he Constitution creates no entitlement to grievance procedures or access

---

[10] Additionally, to the extent that Stephan and Dennis do not have medical training, education, or experience, and to the extent they relied on those that do, such reliance is allowed. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (officials entitled to rely on judgment of medical personnel); *see also Miltier*, 896 F.2d at 854 (officials entitled to rely on expertise of medical personnel).

to any such procedure voluntarily established by a state." *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *Daye v. Rubenstein*, No. 10-6938, 2011 WL 917248, at * 2 (4th Cir. March 17, 2011); *Ashann–Ra v. Commonwealth of Virginia*, 112 F.Supp.2d 559, 569 (W.D.Va.2000) ("[A] prison official's failure to comply with the state's grievance procedure is not actionable under § 1983."); *Roberts v. Lewis*, C/A No. 2:17-177-RMG-MGB, 2017 WL 1148594, at *6 (D.S.C. Mar. 3, 2017) (finding prisoner had no constitutional claim for prison officials ignoring his grievances) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)), report and recommendation adopted, 2017 WL 1134717 (D.S.C. Mar. 24, 2017).

Plaintiff has failed to provide any admissible evidence that his grievances were ignored. Additionally, and as stated above, because a state grievance procedure or RTSM process does not confer any substantive constitutional rights on an inmate, Plaintiff's constitutional rights have not been violated and Defendants are entitled to qualified immunity. Accordingly, the undersigned recommends the district judge grant Defendants' motion for summary judgment as to Plaintiff's claims based on grievance procedures.

4.     Plaintiff's Motions for Discovery and to Appoint Counsel

On October 23, 2020, Plaintiff submitted a motion for discovery, requesting certain documents, including those that have been submitted to

22

the court by Defendants with their motion for summary judgment and mentioning a subpoena for an officer that may be a witness. [*See* ECF No. 23, *see also* ECF No. 25 (indicating difficulties with receiving mail)].

As correctly noted by Defendants [ECF No. 24], the August 21, 2020 scheduling order entered by the court [ECF No. 19] provides for a deadline for discovery to be completed no later than October 19, 2020. Because Plaintiff failed to serve on Defendants discovery requests during the discovery period set by the court [*see* ECF No. 24], Plaintiff's motion for discovery is denied.[11]

Likewise, the court denies Plaintiff's motion to appoint counsel. [ECF No. 30]. There is no right to appointed counsel in a case filed pursuant to 42 U.S.C. § 1983. *Cf. Hardwick v. Ault*, 517 F.2d 295, 298 (5th Cir. 1975). While the court is granted the power to exercise its discretion to appoint counsel for an indigent in a civil action, 28 U.S.C. § 1915(e)(1); *Smith v. Blackledge*, 451 F.2d 1201 (4th Cir. 1971), such appointment "should be allowed only in exceptional cases." *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). After a review of the motion, the court has determined that there are no exceptional or unusual circumstances presented which would justify the appointment of

---

[11] In his motion for discovery, Plaintiff also seeks to know the status of his motion to amend his complaint. [*See* ECF No. 23]. The court entered order on July 30, 2020, [ECF No. 11] deeming Plaintiff's motion to amend his complaint moot because the court had directed Plaintiff's amended complaint to be served. Plaintiff appears to argue the court's order rendered his case, not just his motion, moot. [*See* ECF No. 25]. However, the court's July 30,

counsel, nor would Plaintiff be denied due process if an attorney were not appointed. *Whisenant v. Yuam*, 739 F.2d 160 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Court*, 490 U.S. 296 (1989). The issues in most civil rights cases are not complex, and whenever such a case brought by an uncounseled litigant goes to trial, the court outlines the proper procedure so the uncounseled litigant will not be deprived of a fair opportunity to present his or her case. Accordingly, Plaintiff's motion for a discretionary appointment of counsel under 28 U.S.C. § 1915 (e)(1) is denied.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned denies Plaintiff's motions for discovery and to appoint counsel [ECF Nos. 23, 30] and recommends the district judge grant Defendants' motion for summary judgment. [ECF No. 26].

IT IS SO ORDERED AND RECOMMENDED.

*Shiva V. Hodges*

January 26, 2021                             Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

---

2020 order held only his motion moot.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).